LOUIS F. QUAGLIA et al., Appellants, v INCORPORATED VILLAGE OF MUNSEY PARK, Respondent.

Second Department, December 6, 1976

*Patrick J. Rohan (Michael P. Sanchirico* on the brief), for appellants.

*Williams & Rosetto (Fred A. Williams* of counsel), for respondent.

MARGETT, J. The issue raised is whether the execution, in 1975, of a *resolution* enacted in 1935, must be upheld where the action taken results in a deprivation of significant property rights without any public benefit in light of circumstances existing in 1975.

Plaintiffs' property consists of a more or less rectangular-shaped parcel whose eastern boundary is contiguous with a portion of the western boundary of the defendant village. It lies between two streets—Hunt Lane to the east and Chase Road to the west. Hunt Lane is an east-west thoroughfare within the defendant village, which terminates at the village's western boundary line. It touches upon the northeastern portion of plaintiffs' parcel. Chase Road, in the Town of North Hempstead, runs east-west to a point several feet north of the northwestern portion of plaintiffs' property and then turns at a right angle to the north. Although Chase Road does not touch upon plaintiffs' property, its east-west leg borders the lot immediately to the west of plaintiffs' property and its north-south leg borders the parcel immediately to the north of plaintiffs' property. Prior to 1973, all three of these parcels were part of one large tract of land owned by one Lawrence W. Goodman.[1] Goodman's driveway, located on plaintiffs' parcel, enters into Hunt Lane.

In 1973 the Goodman property was sold to the Island Carpentry Corporation, owned by one Seymour Schwartz. The Goodman tract was subdivided as aforesaid and, by contract dated May 30, 1973, the plaintiffs agreed to purchase the parcel, subject to a number of fairly standard preconditions. By letter dated August 10, 1973, counsel for the village formally advised the attorneys for Mr. Schwartz that the

---

1. In addition to the parcels to the west and north of plaintiffs' property, a small lot to the east, within the Village of Munsey Park, was also carved out of the original holding.

village intended to dead-end Hunt Lane at the village boundary. The letter made reference to a prior inquiry by counsel for Schwartz and stated that the purpose of the letter was to inform Schwartz "in advance of the intention of the Village so that it may be in mind in relation to his disposition of the property."

It should be noted at this point that the "dead-ending" referred to in the letter of August 10, 1973 was, in fact, a contemplated closing of the end of Hunt Lane by means of a barricade. The said closing had been authorized by a resolution adopted by the village trustees in 1935. Two other thoroughfares which also ended at the village boundary, Eakins Road and Thayer Road (also known as Nassau Avenue), were likewise to be barricaded pursuant to that resolution.[2]

Barricades were indeed erected, shortly after passage of the said resolution, on Eakins Road and Thayer Road. That action was challenged by one Stephen N. Mason, who owned the tract to the north of those two roads, and whose access to them was cut off by the closings. The Supreme Court (HOOLEY, J.) held that the action taken by the village was "not arbitrary or unreasonable and [that it] was a fair exercise of the power of the [village] board" (Mason v Incorporated Vil. of Munsey Park, dated Feb. 25, 1936, affd 249 App Div 637, affd 275 NY 504).

The contemplated barricade at the end of Hunt Lane was not erected immediately subsequent to the enactment of the said resolution, apparently because Chase Road, to the west of the Goodman property, was not constructed until the 1950's. Accordingly, an official map of the village filed in 1936 bears the notation that the north ends of Eakins and Thayer Roads are closed, but there is no reference thereon to the closing of Hunt Lane.

However, it is clear that the village never abandoned its intent that Hunt Lane be closed. Goodman's access to Hunt Lane was blocked for at least one 24-hour period every year by means of a wooden barricade. The 1956 minutes of the Village Board of Trustees contain a statement by the Mayor that he would personally request Goodman to "make plans to abandon this Hunt Lane entrance to his property in favor of

---

2. Three-foot wide parcels at the westerly end of Hunt Lane and at the northerly ends of the other two streets had been deeded to the village in 1935 by the Hasset Realty Corp., which had laid out the streets and subdivided much of the adjoining land.

the new road, being constructed to the west of his property." In an official map of the village filed in 1963, an addition has been made to the previous entry in the legend, so that it reads: "Oct. 16, 1935 PORTION OF STREET CLOSED EAKINS RD. (NORTH END) Oct. 16, 1935 PORTION OF STREET CLOSED THAYER RD. OR NASSAU AVE. (NORTH END) & WEST END OF HUNT LANE".

With the foregoing historical background in mind, we turn again to the chronology of events in 1973 and thereafter. As already noted, the Island Carpentry Corporation, owned by Mr. Schwartz, had acquired the Goodman property in 1973 and subdivided it into four lots. On May 30, 1973 the plaintiffs contracted to purchase one of these four lots, which lot had been left with access to Hunt Lane only, via Goodman's original driveway. Title was to close on or about August 21, 1973. On July 13, 1973 the plaintiffs contracted to sell their original home, title to be delivered on August 27, 1973. By letter dated August 10, 1973 the village formally notified Mr. Schwartz that Hunt Lane would be closed and advised him to proceed accordingly in his disposition of the property. Plaintiffs learned of the village's intention to erect a barrier on August 18, 1973, three days before the scheduled closing on the subject property and nine days before they were to pass title to their former home.

Nevertheless, the plaintiffs elected to take title on August 21. They negotiated an agreement with their grantor that if "Hunt Lane is closed and access to the subject premises cut off, the Seller shall provide the Purchasers with other permanent means of ingress and egress by easement to the subject premises, 10 feet wide as determined by the Seller, along the easterly property line of lot #32 [the parcel directly to the west of plaintiffs' property] leading into Chase Rd. to a maximum of 40 feet along the common property line." In the event such "alternate access" were to become necessary, the grantor agreed to pay the plaintiffs $250 toward the cost thereof.

It appears that the plaintiffs thereafter proceeded on the assumption that their grantor would furnish a suitable easement connecting their property with Chase Road. By letter to the village, dated September 20, 1973, plaintiff Louis F. Quaglia acknowledged that he had been advised that Hunt Lane would be closed, and requested "that the physical closing be delayed until [alternate] access can be opened." Subsequently, on November 8, 1973, plaintiffs' grantor sent a document

conveying an easement 15 feet wide and 40 feet long on the easterly property line of lot No. 32, and a check for $250. The easement provided access to Chase Road. The plaintiffs refused to accept the proposed easement on the grounds (1) there would be a sharp curvature where the easement linked with their driveway and (2) there was a considerable difference in grade between their parcel and lot No. 32. However, in his letter of refusal, dated January 26, 1974, Mr. Quaglia stated he was willing "to accept any alternate access route * * * [the grantor] may offer provided it meets the essential needs of my property without reducing its safety or value."

The record is silent as to what, if any, negotiations took place between the plaintiffs and their grantor over the next several months with respect to such an alternative easement. In any event, the plaintiffs did not construct a driveway from their property to Chase Road and continued to use Hunt Lane for ingress and egress. In January, 1975 plaintiff Louis F. Quaglia wrote to the village, stating that he had been informed, upon inquiries of the fire department, that it would be impossible for emergency vehicles to enter his property if the contemplated barrier were erected. Subsequently, by letter dated April 11, 1975, the village notified plaintiffs that a contract had been awarded for the erection of the barrier, and a stone barrier was, in fact, erected on June 2, 1975.

On the day on which construction of the wall was started, plaintiffs moved for a preliminary injunction, contending, *inter alia*, that the defendant village was estopped from constructing the barricade. That motion was denied by Mr. Justice LIFF. Both parties thereafter moved for summary judgment on plaintiffs' complaint, which seeks a permanent injunction and damages. The defendant village also moved to dismiss the complaint. It is from the resulting order in favor of the village that this appeal has been taken.

The order appealed from should be reversed on the ground that the execution of the 1935 resolution some 40 years after its enactment was improper in the light of changed circumstances, and was an unreasonable interference with plaintiffs' right of access to Hunt Lane. It is well settled that, as a general rule, one whose property abuts a public street has a right to have the street remain unobstructed and used by the public for public purposes so as not to interfere with his ingress and egress from his property (10 McQuillin, Municipal Corporations [3d ed], § 30.54). This general rule applies

whether or not the abutting owner owns the fee of the street (Reagan v Lanze, 40 NY2d 475). Any obstruction of streets and highways, or the work carried on in them of a public nature, must be reasonable and necessary for the public improvement which is made (Farrell v Rose, 253 NY 73). Indeed, this court has recognized that while a property owner may be deprived of his right of access to a particular public highway, such deprivation must be "reasonably necessary in the interest of public safety or welfare" (Matter of Syosset Ind. Bldrs. v Town of Oyster Bay Highway Dept., 24 AD2d 763).

The defendant village urges that the resolution in question should be examined in the light of the circumstances attendant upon its enactment in 1935, rather than those exisintg in 1975, when the permanent barrier was finally erected. Such a requirement would shackle this court to chains which had already rusted and broken apart through the passage of time.

While there is authority to the effect that a statute may only be repealed by the legislative body which enacted the law (McGlone v Nann, 256 App Div 549; McKinney's Cons Laws of NY, Book 1, Statutes, § 374), and that the courts may not effect such a repeal merely because the purposes underlying the original enactment of the statute no longer apply, the rule is certainly otherwise with respect to resolutions. Indeed, we are not even dealing here with an ordinance, which may properly be defined as a "local law of a municipal corporation, duly enacted by the proper authorities, prescribing general, uniform, and permanent rules of conduct, relating to the corporate affairs of the municipality" (5 McQuillin, Municipal Corporations [3d ed], § 15.01, pp 38-39). An ordinance provides a permanent rule of government or conduct designed to affect matters arising subsequent to its adoption (Matter of Jewett v Luau-Nyack Corp., 31 NY2d 298).

A resolution deals with matters of a temporary or special nature, where the action taken generally involves findings of fact and may be characterized as administrative (Matter of Jewett v Luau-Nyack Corp., supra). Because of its very nature, a resolution adopted for a particular and temporary purpose continues for a reasonable period only, and in such a case a formal repeal is not, of course, required to terminate its operation (5 McQuillin, Municipal Corporations [3d ed], § 15.42).

Even certain kinds of ordinances, and in particular zoning

ordinances, may be rendered invalid by changes in circumstances subsequent to their adoption (*Evanns v Gunn,* 177 Misc 85, 87, affd 262 App Div 865; *People v Leighton,* 44 NYS2d 779, 782; see *City of New York v Parker Assoc.,* 5 Misc 2d 633), at least where the subsequent changes were not illegal in character (*People v Derison,* 57 Misc 2d 1003). As Mr. Chief Justice HUGHES, writing for the Supreme Court of the United States more than 40 years ago, put it: "The principle that a police regulation, valid when adopted, may become invalid because in its operation it has proved to be confiscatory, carries with it the recognition of the fact that earlier compliance with the regulation does not forfeit the right of protest when the regulation becomes intolerable" (*Abie State Bank v Bryan,* 282 US 765, 776).

While there may have been some valid public purpose to be served by the enactment of the subject resolution 41 years ago, the nature of the development that has since taken place in the vicinity of Hunt Lane has rendered the defendant village's belated action unreasonable and intolerable. The land to the north and west of the plaintiffs' parcel has been subdivided and is served by Chase Road. The development in the Town of North Hempstead, adjacent to the defendant village's westerly border, is unquestionably of a residential character. Hence there is virtually no prospect that Hunt Lane will be extended to the west or that the peace and tranquility of the defendant village will be shattered as a result of this court's decision. Should zoning patterns in North Hempstead change in the future so that a barricade at the end of Hunt Lane would be necessary for the public welfare of the citizens of Munsey Park, there would be ample opportunity for the village board to take action. But, as the area is currently developed, the barricade at the end of Hunt Lane promotes no public purpose and does little more than keep plaintiffs' two cars, and those of their visitors, off the streets of Munsey Park.

I would add that in my view there is no merit to the estoppel argument advanced by the plaintiffs. In order to establish the equitable right to an estoppel, the party adverse to a municipality must show (a) lack of knowledge and the means of knowledge of the truth as to the facts in question, (b) reliance upon the conduct of local government personnel and (c) action based thereon of such a character as to change his position prejudicially (2 Antieau, Municipal Corporation Law,

§ 16A.02). The plaintiffs failed to satisfy any of these criteria. They took *title* with actual knowledge of the 1935 resolution and with knowledge of the village's intent to execute the said resolution.

It is true, as my brother Justice TITONE points out, that plaintiffs *contracted* to purchase the subject property before they had any knowledge of the resolution. But it can hardly be seriously contended that a purchaser of real property has a right to assume there are no restrictions on the property merely because a visual inspection discloses none. Thus, a title search is generally conducted after a contract of sale is entered into. If restrictions unacceptable to the purchaser are revealed by such a search, he may withdraw from the deal or alter the terms of the transaction, as the contract allows. I know of no authority, however, which would allow such a purchaser to claim that a third party was estopped from enforcing a restriction merely because the purchaser had contracted without knowledge of the restriction.

Indeed, there is no evidence that plaintiffs relied on the official map of the village to their detriment. Even if a purchaser could rely to his detriment by contracting to purchase a house, the record is devoid of any suggestion that plaintiffs inspected the official map of the village before entering into the contract. As has already been noted, such an inspection would normally take place after the execution of a contract and before the closing of title. Furthermore, the notation on the map to the effect that the west end of Hunt Lane was "closed" would alert any reasonably prudent person to inquire further.

Nevertheless, the defendant's 1975 erection of a barrier at the mouth of plaintiffs' driveway had no justification in the interest of public safety or welfare and, accordingly, the order appealed from must be reversed, defendant's motion for summary judgment should be denied and the plaintiffs' cross motion for summary judgment should be granted to the extent of granting the injunctive relief sought. The plaintiffs, in their brief and oral argument, have apparently abandoned their claims for compensatory and punitive damages.

TITONE, J. (concurring). Since August, 1973 the plaintiffs have been the owners of an improved parcel of land, situated in the Town of North Hempstead, which adjoins a portion of the westerly boundary of the defendant village. Plaintiffs' property, together with three other adjoining lots, one of

which is located within the village, was formerly part of a tract of land known as the "Goodman property". The Goodman property fronted on the easterly and southerly sides of Chase Road (a street not within the village), and on the westerly end and southerly side of Hunt Lane (a village street which ended at the Goodman property). The driveway of the house on the subject property leads to the westerly end of Hunt Lane and was used for access by the original owner of the entire tract, Dr. Goodman. Upon the death of Dr. Goodman, the entire tract was purchased and subdivided. As a result of the subdivision, the plaintiffs' plot, upon which the house and driveway are located, was left with frontage only on the westerly end of Hunt Lane.

With respect to governmental action vis-à-vis the Goodman tract as it pertains to the dispute herein, the record reveals that, in 1935, the Village Board of Trustees resolved that the westerly end of Hunt Lane and the northerly ends of two other streets (Eakins and Thayer, or Nassau) be discontinued, that the streets be closed by suitable barriers, and that the official map of the village be amended to show the changes. The evidence indicates that the permanent barriers have been in place across the northerly ends of Eakins Road and Thayer Road for many years; however, no such permanent barrier was erected across Hunt Lane in the ensuing years from 1935.

The village admits that the plaintiffs' predecessor in title continued to have access to Hunt Lane from the driveway after the adoption of the resolution in 1935, except for a 24-hour period once a year when access was barred by a temporary wooden barricade. The placing of the temporary barrier each year, and the accompanying expenses, were reported to the Village Board of Trustees and recorded in its minutes. At a meeting of the board in July, 1956, the Mayor stated that he would request plaintiffs' predecessor to "make plans to abandon this Hunt Lane entrance to his property".

An official map of the village, filed in 1936, lists the legend revisions through April 1, 1936. Under the date of October 16, 1935, there is the notation that the north ends of Eakins and Thayer are closed, but there is no reference to the closing of Hunt Lane. The map proper bears the notations at the northerly end of both Eakins and Thayer: "Portion of St Closed Oct. 16, 1935" and "Barrier Erected". *There is no notation with respect to either a closing, dead end, or barrier at the westerly end of Hunt Lane.* In the official map of the village filed in

1963, an addition has been made to the previous entry in the legend so that it reads: "Oct. 16, 1935 PORTION OF STREET CLOSED EAKINS RD. (NORTH END) Oct. 16, 1935 PORTION OF STREET CLOSED THAYER RD OR NASSAU AVE. (NORTH END) & WEST END OF HUNT LANE".

However, while on the map proper the notation at the north end of Thayer is "BARRIER ERECTED PORTION OF ST. CLOSED OCT. 16, 1935", and the notation at the north end of Eakins is "PORTION OF ST. CLOSED OCT. 16, 1935 DEAD END—BARRIER ERECTED JUNE 13, 1934", the only notation at the west end of Hunt Lane is "DEAD ENDED Oct. 16, 1935".

On May 30, 1973 the plaintiffs contracted to purchase the subject property, title to close on or about August 21, 1973. On August 18, 1973 they first learned of the village's intention to erect a barrier at the westerly end of Hunt Lane, cutting off access to the driveway of the subject property. When the plaintiffs took title on August 21, they obtained an easement from the seller over the plot to the west, providing access to a street outside the village. In June, 1975, the village constructed a permanent barrier across the west end of Hunt Lane.

On this record, the defendant should be estopped from asserting a right to erect the permanent barrier (cf. *La Porto v Village of Philmont,* 39 NY2d 7). "[W]hen lands abut upon a public street, there is appurtenant to such lands an easement of access over the public street, whether or not the abutting owner owns the fee of the street" *(Regan v Lanze,* 40 NY2d 475, 482). Furthermore, a prospective purchaser is entitled to rely on the official map, which, by statute, "is to be deemed to be final and conclusive with respect to the location and width of streets * * * shown thereon" (Village Law, § 7-724, formerly §§ 179-e and 179-h).

The term "dead end" appears to have no legal significance and is to be given its ordinary meaning, which is defined as "an end * * * that has no exit or continuation", a "blind alley", a "cul-de-sac" (see Webster's 3d New International Dictionary; *Wickham v Town of Newfane,* 190 Misc 880). Since the westerly end of Hunt Lane has always terminated at the driveway of the subject property, the notation on the map proper that Hunt Lane was "DEAD ENDED" provides no indication that the street was ever designated to be closed. Both to a motorist and an abutting owner, the term "dead end" does not connote the closing of a street by a municipal authority;

rather it is deemed synonymous with the term "no through traffic". Prospective purchasers frequently elect to purchase property abutting on a dead end street because of the relative quiet, privacy and safety derived therefrom. It is common knowledge that owners of property abutting a dead end street, their guests, and others, enjoy unlimited access to and from such abutting property by motor vehicles.

I am also constrained to the view that the addition to the official map in 1963 of the legend that the westerly end of Hunt Lane was closed on October 16, 1935, and that Eakins and Thayer Roads were also closed on the same day, would logically cause the viewer to examine and compare the notations on the face of the map itself with respect to those streets. Such comparison of the notation "DEAD ENDED" at the westerly end of Hunt Lane, with those at the northerly ends of Eakins Road ("PORTION OF ST. CLOSED OCT. 16, 1935 DEAD END-BARRIER ERECTED JUNE 13, 1934") and Thayer Road ("BARRIER ERECTED PORTION OF ST. CLOSED OCT. 16, 1935"), would undoubtedly leave the reader with the belief that there is legal and unobstructed access to and from Hunt Lane, the only street on which the subject property abuts. Faced with the ambiguity between the legend and the map itself, the plaintiffs had the right to rely on the latter, since the map and the amendments thereto were official acts mandated by the resolution of the village fathers (see *La Porto v Village of Philmont,* 39 NY2d 7, 12, *supra),* while the legend, being merely descriptive, is not necessarily totally accurate as to what was to follow (see *Van Ruiten v Van Ruiten,* 74 Cal Rep 186).

The Court of Appeals has said that "where a governmental subdivision acts or comports itself wrongfully or negligently, inducing reliance by a party who is entitled to rely and who changes his position to his detriment or prejudice, that subdivision should be estopped from asserting a right or defense which it otherwise could have raised" *(Bender v New York City Health and Hosps. Corp.,* 38 NY2d 662, 668). We have stated that the "courts must weigh the degree of manifest injustice against the effect, in the particular case, of intervention into the public processes" *(Eden v Board of Trustees of State Univ. of N.Y.,* 49 AD2d 277, 284). The application of these principles to the facts at bar mandates that the doctrine of estoppel be invoked. It is clear that the village acquiesced in the continued use by plaintiffs' predecessor of the village

street as an access to the driveway of the subject premises. The village has advanced no explanation for its failure to deal with the westerly end of Hunt Lane as it had dealt with the northerly ends of Eakins and Thayer. The plaintiffs, on the other hand, are blameless and, by entering into a contract to purchase the subject property, and by contracting to sell and give possession to their former home, they changed their position to their detriment. Furthermore, this record seems particularly devoid of any evidence which would warrant holding that the erection of a barrier across Hunt Lane is in furtherance of the public health and welfare.

The injustice to the plaintiffs far outweighs any willowy effect upon public interest which may result if estoppel is invoked. The refusal to invoke estoppel deprives the plaintiffs of what was an important consideration in their purchase of the subject property, to wit, access from their driveway to the abutting village street. It is undenied that when the plaintiffs took title to the subject property, the lot met all legal requirements. With the barricade erected it may be necessary for the plaintiffs to go to the expense of obtaining a variance from the town. In contrast, if estoppel is invoked, the harm to the village is not apparent and probably nonexistent. Whatever considerations motivated the passage of the resolution 41 years ago no longer seem to exist. The village admits that each of the resident owners of property on Hunt Lane within the block front of the subject property and the next easterly block front protested in writing the closing off of Hunt Lane to the plaintiffs and requested that it remain open for the plaintiffs' use. The original property has been subdivided and only the plaintiffs' parcel would have access to Hunt Lane. Any increase in traffic would be limited to the vehicles of the plaintiffs and their visitors. Plaintiffs' acceptance of title to the subject parcel, with an easement over adjoining land, does not constitute a waiver in view of the fact that they were obligated to convey title to their former home only one week after they received notice of the village's intention to erect the barricade. They brought suit to restrain the village immediately after the village began construction. On the record, and since every element of estoppel is present, the plaintiffs should be accorded the right to use and enjoy their property free from any further bureaucratic harassment. Accordingly, the order of Special Term should be reversed, and the plaintiffs' cross motion for summary judgment should be granted to the

extent of enjoining the defendant village from erecting a barrier or wall across Hunt Lane.

DAMIANI, J., concurs with MARGETT, J.; TITONE, J., concurs with a separate opinion; HOPKINS, Acting P. J., and SHAPIRO, J., dissent and vote to affirm the order on the opinion of Mr. Justice OPPIDO at Special Term.

Order of the Supreme Court, Nassau County, dated January 7, 1976, reversed, on the law, without costs or disbursements, defendant's motion for summary judgment denied, and plaintiffs' cross motion for summary judgment granted to the extent that the defendant is enjoined from erecting a barrier or wall across Hunt Lane.