ABIE STATE BANK ET AL., APPELLEES, V. ARTHUR J. WEAVER, GOVERNOR, ET AL., APPELLANTS.

FILED DECEMBER 7, 1929. No. 27070.

C. A. Sorensen, Attorney General, Charles E. Abbott, Edgar Ferneau, L. Ross Newkirk and Roy M. Harrop, for appellants, Weaver and others.

William J. Hotz, Clinton J. Campbell, Frank A. Hebenstreit, Ralph G. Coad and Robert Hotz, for intervening appellants.

Gaines, McGilton, Van Orsdel & Gaines, Courtright, Sidner, Lee & Gunderson and Hainer, Flansburg & Lee, contra.

Albert S. Johnston, amicus curiæ.

Heard before GOSS, C. J., ROSE, DEAN, GOOD, THOMPSON, EBERLY and DAY, JJ.

DEAN, J.

This is an injunction suit begun in the district court for Lancaster county by the Abie State Bank, plaintiff, on its own behalf, and in which plaintiff is joined by 558 other Nebraska state banks. The suit was brought to enjoin the collection of a special assessment of one-fourth of one per cent. of the average daily deposits from the state banks for 1928. It is alleged by plaintiff that the special assessment complained of was made December 15, 1928, by the department of trade and commerce, for the benefit of the

depositors' guaranty fund, pursuant to authority conferred by section 8028, Comp. St. 1922, as amended by section 26, ch. 191, Laws of 1923. The act, as amended, follows:

"If the depositors' guaranty fund shall, from any cause, be depleted or reduced to any amount less than one per cent. of the average daily deposits as shown by the last semi-annual assessment statement thereof filed, the department of trade and commerce shall levy a special assessment against the capital stock of the corporations governed by the provisions of this article, to cover such deficiency, which special assessment shall be based on the said average daily deposits, and, when required for the purpose of immediate payment to depositors, said special assessment may be for any amount not exceeding one per cent. of said average daily deposits for the year 1923 and thereafter not exceeding one-half of one per cent. of said average daily deposits in any one year."

The governor of Nebraska and the secretary of the department of trade and commerce are both made parties defendant in official capacity. The state treasurer and a number of individual bank depositors intervened in the action adversely to the plaintiff's contention. The court, however, found generally in favor of the plaintiff bank and against the defendants and interveners. Thereupon defendants were ordered to pay all costs of the action, except those incurred by the interveners, and the cross-petitions of the interveners were dismissed and interveners ordered to pay their own costs. Defendants and a number of the interveners have appealed.

The secretary of the guaranty fund commission, hereinafter called the secretary, testified that up to and including December 31, 1928, 269 state banks were closed by the state and placed in the hands of the commission, and that the total amount of the adjudicated claims was then $10,536,518.59, exclusive of interest; and that in 72 state banks, then being operated as going concerns, the amount due depositors was $13,726,441.26, and the total amount due depositors in banks which were in receivership, but whose claims were not yet adjudicated, was $2,133,627.54.

It also appears from the secretary's evidence that the total amount, including claims adjudicated, and claims not ad-judicated, or present liabilities against the guaranty fund, was $26,400,282.76, and that the total sum of assets to be realized would be $10,451,932.65, leaving $15,948,350.11 as a deficit. The secretary also testified that the majority of the losses sustained by the banks resulted from loans made prior to 1923 during the deflation period.

From the evidence of Clarence G. Bliss, secretary of the department of trade and commerce, it appears that since 1919 the total amount of bank assessments was $14,609,-576.65, and that these assessments, in the above sum, were paid over and became a part of the guaranty fund.

It appears from the evidence of the president of one of the largest Nebraska state banks that he was active in the publication of 2,000 pamphlets which were distributed generally in respect of the establishment of the guaranty fund, and he was also chairman of a committee of three bankers by whom this suit was begun. In his expressed opinion, the payment of the special assessment, and its continuance for a number of years, would have the effect of causing the large state banks to "nationalize—all who can will nationalize and the balance will go out of business. I think four hundred banks will be operating with impaired capital."

In 1926, during the months of June, July, August, and September, twenty-six, full-page newspaper advertise-ments, attractively featured with pictures and aptly pre-pared reading matter, appeared in one of Omaha's lead-ing newspapers. These advertisements stressed the pro-posed protection that was shortly to be afforded the de-positors of money in the state banks throughout Nebraska. And on one page of these advertisements 336 banks are listed as having paid their *pro rata* share of the cost of the publication. The largest state bank, located in Omaha, paid between $500 and $600 as its share of the expense of this newspaper publicity. The enterprise was given wide circulation in practically every town and its suburbs where a state bank was located, by illustrated newspapers with

reading matter that was calculated to attract favorable attention, and the patronage as well, of those having money for bank deposit. Following are some of the headings of the illustrated pages:

"A Story no other State can Tell;" "No Mattress Banks in Nebraska;" "Strong Banks make Strong States;" "In the Hands of Skilled Bankers;" "State Banks Protect Their Deposits in Nebraska;" "Nebraska is a Remarkable State;" "Pushing Your Money Through the Window;" "In Nebraska the Guarantee Works both Ways;" "All Work together in Nebraska;" "Safe Through the Slump of Deflation Days." "The Men Who Told the Story that No Other State Can Tell" concludes the series of illustrated pages, and is followed by an enumerated list of 336 state banks that sponsored the depositors' guaranty fund enterprise.

From the evidence it clearly appears that a majority of the state bankers throughout Nebraska, and many others as well, counted the bank depositors' guaranty fund, in its inception, a valuable asset, and many predicted that this beneficent plan would add greatly to the stability of the state banks. To illustrate this feature of the guaranty fund law, a brief excerpt from an advertisement which appeared in January, 1928, in one of the Nebraska papers having a large circulation, may be noted:

"First, there are a few state bankers here and there who have good banks and who think they are greatly imposed upon by being compelled to pay an assessment to the guaranty fund. This is a natural feeling as they are in no way responsible for the banks that fail. * * * The guaranty fund, so-called, is merely an insurance company whereby the state banks of Nebraska are the members and must pay through an assessment each other's losses up to the maximum amount of six-tenths of one per cent. a year. * * * Any good bank, making a fair profit, can pay this assessment without injury to itself and can do so to the great benefit of the state."

In respect of the many failures of banks about this time, the cashier of a Lincoln state bank testified that, in his opinion, the failure of nearly 300 Nebraska state banks

was caused largely by the general economic condition existing prior to 1928; that he did not think the bank assessments from 1923 to July 1, 1928, were a contributing factor in the failure of banks during that period, and that, in his opinion, the guaranty fund law and the assessments collected thereunder had a steadying influence on the deposits of every state bank. Continuing, he testified that "it is no exaggeration to say it has accounted for at least one hundred million dollars deposited in the state banks of Nebraska which would not otherwise have been made except for the bank guaranty law." In his opinion, the conditions of the banks and their ability to pay the assessment is "incomparably better than in 1923."

In the present case, the trial court found that the guaranty fund was confiscatory, and that its enforcement constituted the taking of private property without due process, and that there should therefore be an indefinite abatement of the enforcement of the act until such time as such enforcement could be made without mischievous consequences. It may be observed, however, that the bank guaranty fund law has been held by the highest court in the land to be a constitutional act and well within the meaning of the federal Constitution.

Substantially like questions as here involved were considered and decisions were rendered by the supreme court of the United States in *Noble State Bank v. Haskell*, 219 U. S. 104, and *Assaria State Bank v. Dolley*, 219 U. S. 121, and in both cases it was held that the act was not repugnant to the provisions of the Constitution. And in *Shallenberger v. First State Bank*, 219 U. S. 114, a case involving the validity of the guaranty fund law of our own state, the act was again upheld on authority of the decision in the above cited *Noble State Bank* case. In its memorandum opinion (219 U. S. 575) denying the application for rehearing in the *Noble State Bank* case, the court said:

"Even where powerful arguments can be made against the wisdom of (this) legislation this court can say nothing, as it is not concerned therewith." And in the body of the opinion, Mr. Justice Holmes, the author of the opinion, among others, made this observation:

"We fully understand the practical importance of the question and the very powerful argument that can be made against the wisdom of the legislation, but on that point we have nothing to say, as it is not our concern. * * * The payment can be avoided by going out of the banking business, and is required only as a condition for keeping on, from corporations created by the state."

*First State Bank of Claremont v. Smith,* 49 S. Dak. 518, is cited by defendants and is in point. The court there observed that the banks had for many years accepted the benefits of the guaranty fund law and in consequence were not then in position to resist the just claims of depositors. The court also observed that the personal rights of the individual must always yield to the "rightful exercise of the police power."

The Nebraska statute contains this provision for the direction of those who are charged with the administration of banking:

"The business of banking, or the receiving of deposits of money or instruments of credit subject to be repaid upon check, draft, certificate, passbook or order; the discounting, negotiating of promissory notes, drafts, bills of exchange, and other evidences of debts; and the loaning of money upon personal or other security is hereby declared to be a quasi-public business and subject to regulation and control by the state." Comp. St. 1922, sec. 7983.

"The banking business, carried on pursuant to a state charter, is quasi-public and, for protection of the public and in its interests, is subject to reasonable regulation by the state." *Citizens State Bank v. Strayer,* 114 Neb. 567.

It may here be noted that the maximum amount of the guaranty fund special assessment was reduced by the legislature in 1923 from one per cent. to one-half of one per cent., but subsequently the department of trade and commerce, pursuant thereto, levied the special assessment of one-fourth of one per cent., within the maximum amount now fixed by the legislature, and of which complaint is now made by the plaintiff bank on its own behalf and in behalf of 558 other state banks, as above noted.

The paramount object, and clearly the legislative intention in the creation of the depositors' bank guaranty fund law, was first for the protection of the depositors' money in the state banks. And from the fact that, under normal banking conditions, such act would likewise benefit the state banks, such banks were, at least, not unfriendly to the enactment of the law in question. But it goes without saying that there never was, nor could be, any compulsion upon the state banks to accept deposits of money on the bank guaranty basis. But money was accepted by the state banks, pursuant to the terms of the depositors' guaranty fund law, and by that law such banks are clearly bound.

The demands on the guaranty fund are burdensome, but the situation before us was created, or in any event was made possible, by the legislature in the enactment of the law. It is a basic principle that it is, ordinarily, not within the province of the courts to annul a legislative act except as a last resort and in a case where no other remedy is at hand. In view of the benefits which arose from the deposits of large sums of money in state banks, pursuant to the terms of the bank depositors' guaranty fund, should the banks now be heard to make complaint of the special assessment of one-fourth of one per cent. upon their deposits? Have the observations of Mr. Justice Holmes in the *Noble State Bank* case, above cited, ever been answered? If so, our attention has not been directed thereto.

For the reasons herein appearing, the temporary injunction granted by the district court is dissolved, the judgment is reversed, and the action dismissed.

REVERSED AND DISMISSED.

Eberly, J., concurs in the result.

Rose and Day, JJ., dissent.