HUBBELL BANK ET AL., APPELLANTS, V. CHARLES W. BRYAN, GOVERNOR, ET AL., APPELLEES.

FILED NOVEMBER 10, 1932.   No. 28303.

*Peterson & Devoe,* for appellants.

*C. A. Sorensen, Attorney General,* and *L. Ross New-kirk, contra.*

*F. C. Radke* and *Barlow Nye,* for E. H. Luikart, receiver.

Heard before GOSS, C. J., ROSE, DEAN, GOOD, EBERLY, DAY and PAINE, JJ.

DAY, J.

This is a suit in equity brought by the state banks of Nebraska to enjoin the collection of the regular and special assessments levied for the use of the depositors' guaranty fund and the assessments levied and to be levied for the benefit of the depositors' final settlement fund under the provisions of legislation which became effective March 18, 1930. This suit was brought against the department of trade and commerce and governor of the state, as *ex officio* head of the department. The defendants filed a counterclaim in which they sought to recover a judgment against the banks for the amount of the assessments which had been levied under both statutory provisions. The case was decided upon a demurrer which resulted in the banks being denied relief and a judgment being en-

tered against the banks individually for the amount of assessments levied under both the old and the new law. This suit was determined by the lower court upon a demurrer to the pleadings, so that there is no issue of fact in controversy.

In 1909 the Nebraska legislature enacted a statute (Laws 1909, ch. 10) establishing a depositors' guaranty fund which was created and replenished from the proceeds of assessments based upon average daily deposits levied upon all state banks. The claims of all depositors in failed state banks were to be paid, first, from the assets in the hands of the receivers thereof, and, secondly, if said fund was insufficient, the deficit was to be paid from the depositors' guaranty fund. The statutory provisions creating and regulating the depositors' guaranty fund are found in sections 8024 to 8028, and 8033, Comp. St. 1922, with some amendment thereafter which however did not change the general structure of the depositors' guaranty fund.

There is no necessity to delineate in this opinion the unhappy history of the banking business in Nebraska and particularly those dark pages from 1920 until 1930. It is sufficient for the purpose of this opinion to state that in 1930 the condition was such that the governor called a special session of the legislature primarily to consider the banking situation. This special session (46th Extraordinary) enacted chapter 6, Laws 1930, Special, which is commonly known as the depositors' final settlement fund law, which became effective March 18, 1930. Among other things it provided for the transfer of assets from the depositors' guaranty fund to the depositors' final settlement fund, including certain assessments against the banks which had not been paid, accruing under the old law, and provided for an assessment to be levied upon the state banks for a period of ten years, based upon their average daily deposits. It provided that those who had claims as depositors in banks which had failed prior to March 18, 1930, under the old guaranty fund law

should be paid from this new fund *pro rata*. It repealed the old guaranty fund law, not only by a specific repealing clause, but also by changing the provisions by almost every section of the new law. Consequently, it marked the end, from a legislative standpoint, of the depositors' guaranty fund.

The assessment of state banks for the payment of claims of depositors in failed state banks has from the time of the inception of such legislation been sustained as constitutional as an exercise of the police power of the state. We quote from the opinion of Mr. Justice Holmes in *Noble State Bank v. Haskell,* 219 U. S. 104 (1911), in which he stated this principle as follows:

"Where the mutual advantage is a sufficient compensation, an ulterior public advantage may justify a comparatively insignificant taking of private property for what in its immediate purpose is a private use. The police power extends to all the great public needs, *Camfield v. United States,* 167 U. S. 518, and includes the enforcement of commercial conditions such as the protection of bank deposits and checks drawn against them by compelling cooperation so as to prevent failure and panic."

The Nebraska statute establishing the depositors' guaranty fund was argued before the supreme court of the United States at the same time as the *Haskell* case (*Shallenberger v. First State Bank of Holstein,* 219 U. S. 114), and the judgment in the *Haskell* case was decisive in the latter. From the date of this decision of the supreme court of the United States to the present, there has never been any deviation in any judicial expression from the principle that a depositors' guaranty fund law must rest for constitutional support on the exercise of the police power of the state by its legislature. Further it is held, also, that such an exercise of the police power must not be arbitrary and that its exercise must be related to some public purpose. This view has been recently reiterated by this court. *Abie State Bank v. Weaver,* 119 Neb. 153, and

also in *Weaver v. Koehn,* 120 Neb. 114. To the same effect is the opinion in *Abie State Bank v. Bryan,* 282 U. S. 765. The depositors' final settlement fund act provides for a fund to pay partially and *pro rata* the claims for depositors in state banks closed prior to March 18, 1930, by transferring the assets of the old guaranty fund and the levying of a new assessment upon every state bank. The claims of depositors in banks failing after March 18, 1930, were not protected in any manner by this fund.

The public purpose sufficient to support the constitutionality of the depositors' guaranty fund was the stabilization of commerce and the creation of public confidence in the banks. It had a public purpose. It was within the reasonable exercise of the police power, but the situation with respect to the depositors' final settlement fund is radically different. It had for its sole and only purpose the payment of the claims of depositors in banks which had failed prior to its enactment by levying assessments upon solvent state banks whose depositors did not come within the purview of the act. In practical effect, this new act destroyed the confidence in the state banks. It does not stabilize commerce but tends to disrupt it. In truth, it serves no public purpose which can justify the exercise of police power of the state. Considered from the standpoint of its effect, it does but one thing: It takes money from the solvent state banks, and thereby indirectly from the depositors in these banks, and pays it to depositors in other state banks which had failed prior to its enactment. In this, it creates a classification that is unreasonable and unconstitutional, as we have already held. *Weaver v. Koehn,* 120 Neb. 114.

Due process of law, as a limitation upon the police power, requires that it be exercised in such a manner that it is not arbitrary and unreasonable. *Jay Burns Baking Co. v. Bryan,* 264 U. S. 504; *Fairmont Creamery Co. v. Minnesota,* 274. U. S. 1; *State v. Geest,* 118 Neb. 562.

In excluding depositors whose claims accrued since March 18, 1930, from participation and giving benefits

to depositors in prior failed banks, it deprives plaintiffs of property without due process of law. Taking property of one and giving it to another is not due process. *Missouri P. R. Co. v. Nebraska,* 164 U. S. 403; *Missouri P. R. Co. v. Nebraska,* 217 U. S. 196; *Chicago, St. P., M. & O. R. Co. v. Holmberg,* 282 U. S. 162. There is no judicial authority to support the view that the final settlement fund is related in any manner to a public purpose, but it does in fact, as said by Mr. Justice Dean in *Weaver v. Koehn, supra,* constitute the taking of money belonging to one class to pay the claims of another class. From the brief of the attorney general we quote:

"We agree with counsel for plaintiffs that if the depositors' final settlement law had been passed as an entirely new measure, unrelated to the creation, administration and distribution of the depositors' guaranty fund, there would be little doubt of its unconstitutionality on the ground, so well stated by this court in *Weaver v. Koehn,* 120 Neb. 114, that it would 'constitute the taking of money belonging to one class to pay the claims of those of another class.'"

However, it is then argued that, since the law replaced the old guaranty fund law which did have a public purpose, the depositors' final settlement fund by some process of metempsychosis now has such a public purpose as is essential to support such legislation. To support the view that the legislature has authority, several cases are cited which are not strictly in point for the reason that in no instance has a state legislature attempted to provide for future assessments to pay off the losses in other banks in the past. In at least two of the cases cited, the guaranty fund was voluntary and the banks could come under the provisions or not, as they chose. *Spokane & Eastern Trust Co. v. Hart,* 127 Wash. 541; *State v. Bone,* 120 Kan. 620. In *State v. Smith,* 234 N. W. (S. Dak.) 764, it is shown that the legislature of South Dakota discarded the old guaranty system and established a new and different system whereby each bank was required to build up a

reserve in the state treasury to be maintained for the protection of its own depositors, which remained the private property of the bank. *Wirtz v. Nestos,* 51 N. Dak. 603, involved the matter of the payment of depositors under the old fund as did the case of *Lacy v. State Banking Board,* 118 Tex. 91, in which membership in the state guaranty fund was also optional.

It is contended, however, that this question was adjudicated by *Abie State Bank v. Bryan,* 282 U. S. 765. The legislation was enacted in the interval occurring between the decision in this court and its disposition by the supreme court of the United States. The question of the constitutionality was not and could not have been presented to this court. In the case of *Waters-Pierce Oil Co. v. Texas,* 212 U. S. 86, the court held:

"The jurisdiction of this court, under section 709, Rev. Stat., to review the proceedings of state courts is limited to specific instances of denials of federal rights specially set up in and denied by the state court." See, also, *Silver v. Silver,* 280 U. S. 117; *De Saussure v. Gaillard,* 127 U. S. 216; *Chesapeake & Ohio R. Co. v. McDonald,* 214 U. S. 191.

No ordinary exercise of the judicial process could import into the legislative act of March 18, 1930, any public purpose whatsoever which justified the passage of the act under the exercise of the police power by the legislature. This question was not adjudicated in the case of *Abie State Bank v. Bryan, supra.* Therefore the said act, in so far as it attempts to levy an assessment on state banks to create a fund to pay depositors' claims against banks having failed prior to the enactment thereof, is in violation of the due process clause of the federal Constitution. It is also violative of section 1 of the Fourteenth Amendment. It is also violative of section 3, art. I of the Constitution of Nebraska, in that it deprives persons of their property without due process of law.

Since we have reached the foregoing conclusion, it is necessary to consider the effects thereof, with reference to the repeal of the statutory provisions of the depositors'

guaranty fund. Section 16, ch. 6, Laws 1930, Special (Comp. St. 1929, sec. 8-178) is an expression of the legislative intent and of the inducement for the passage of the act, as to the separability of the various sections.

The legislative expression is that sections 1 to 5, and 16, ch. 6, Laws 1930, Special, are inseparable. Section 18, ch. 6, Laws 1930, Special (Comp. St. 1929, sec. 8-180) provides that sections 6 to 16, inclusive, as far as inducement is concerned, are independent of every other section. Since the legislature expressed itself both ways upon the matter of legislative intention and of inducement, in contradictory language, it would seem to amount to the same thing as an absence of a clear-cut expression of intent. In such a case, it would seem necessary to arrive at the legislative intent without reference to such expression. Such a provision "is an aid merely; not an inexorable command," said Mr. Justice Brandeis in *Dorchy v. Kansas,* 264 U..S. 286. See, also, *Nixon v. Allen,* 150 Ark. 244; *State v. Montgomery,* 177 Ala. 212. The provision in this statute is novel and is apparently original with our legislature. The only cases reported which we have found are concerned with provisions that various parts shall be separable. We adopt the rule that a provision expressing legislative intent as to the separability of the various parts of a statute is an aid merely to judicial interpretation. It is obvious that contradictory provisions are of no aid in this case. It is emphatically argued that section 16 was included in section 18 inadvertently and that we should construe it as though it referred to sections 6 to 15, instead of 6 to 16. It is not the province of the court to amend an act to make it conform to the unexpressed intent of the legislature. *Van Horn v. State,* 46 Neb. 62. In an early case, *In re Groff,* 21 Neb. 647, we read:

"We hold, therefore, that where a part of an act is not dependent upon that which is unconstitutional, and is complete in itself and capable of being executed, it will be maintained."

In *State v. Stuht,* 52 Neb. 209, it was said:

"Another test to be applied here is, may the constitutional and unconstitutional portions of the law in question be separated, and is the former so complete within itself and independent of the latter that the former will be operative and can be enforced without the latter? If so, the former will be upheld and the latter disregarded or rejected. The foregoing is the rule announced and enforced by this court."

The various sections of these statutes will be operative and can be enforced without the invalid provisions. Who can say, in view of the contradictory expressions, which was the inducement? Perhaps, for some members of the legislature one section, and for others a different section, was the inducement. "The legislative intent is the cardinal rule in the construction of statutes." *King of Trails Bridge Co. v. Plattsmouth Auto & Wagon Bridge Co.*, 114 Neb. 734. See *State v. School District*, 99 Neb. 338.

This court cannot say that the legislature would not have passed the repealing clause without the other provisions. The various parts are severable. In 1 Cooley, Constitutional Limitations (8th ed.) pp. 241, 242, quoting from *Smith v. Janesville*, 26 Wis. 291, it is said:

"No one doubts the general power of the legislature to make such regulations and conditions as it pleases with regard to the taking effect or operation of laws. They may be absolute, or conditional or contingent; and if the latter, they may take effect on the happening of any event which is future and uncertain."

The taking effect of the law was not made conditional or contingent, but absolute and immediate. Section 19, ch. 6, Laws 1930, Special, provides: "Whereas, an emergency exists, this act shall be in force and take effect from and after its passage and approval." There was no provision for the law taking effect conditionally or contingently.

But state banks also challenge the constitutionality of the assessments levied under the provisions of the depositors' guaranty fund law beginning with the special assessment of December 15, 1928, and including that of

April 17, 1929, and January 2, 1930, and the regular assessments levied on July 1, 1929, and January 1, 1930, for that by reason of changed conditions the regulatory act in its operation has become confiscatory. These are the same assessments mentioned in subdivision (c), sec. 1 of the depositors' final settlement fund law, which were transferred to that fund.

The defense interposed to this claim is that of *res judicata*. The supreme court of the United States, after a consideration of our depositors' guaranty fund law, held that it was not violative of the federal Constitution in *Shallenberger v. First State Bank of Holstein*, 219 U. S. 114. But this is not so conclusive as to exclude further consideration as to whether under changed conditions and under facts established by experience the assessments imposed thereunder have become confiscatory. In *Abie State Bank v. Bryan*, 282 U. S. 765, it was said:

"As to the first objection, it is sufficient to say that the bank guaranty law was sustained by this court as a police regulation (*Shallenberger v. First State Bank of Holstein, supra; Noble State Bank v. Haskell*, 219 U. S. 104, 575), and that a police regulation, although valid when made, may become, by reason of later events, arbitrary and confiscatory in operation. *Smith v. Illinois Bell Telephone Co.*, 282 U. S. 133, 162; *Allen v. St. Louis, Iron Mountain & Southern R. Co.*, 230 U. S. 553, 555, 556; *Lincoln Gas & Electric Co. v. City of Lincoln*, 250 U. S. 256, 268. In the *Shallenberger* case, the suit was brought immediately upon the enactment of the law, and that decision sustaining the law cannot be regarded as precluding a subsequent suit for the purpose of testing the validity of assessments in the light of the later actual experience."

The rule is stated in the syllabus to be as follows:

"A decision of the supreme court of the United States in a suit brought immediately upon the enactment of a bank guaranty law, holding such law to be constitutional, does not preclude a subsequent suit for the purpose of testing, in the light of later actual experience, the validity

of assessments made thereunder, alleged to be unreasonable and confiscatory, and hence repugnant to the due process clause of the Fourteenth Amendment." (75 L. Ed. 690.)

A further quotation from the opinion in the case is illuminating:

"When the suit was brought, these banks were confronted with a situation which contained no promise of relief from the assessments for which the act, as it then existed, provided, and the cumulative effect of which was alleged to be disastrous. It was the special assessments under the old law that were definitely assailed. Under the modifying act of 1930, only three of these special assessments and two regular assessments remain effective; and, for the future, there is a limitation of the obligation to a total annual assessment of two-tenths of one per cent. of average daily deposits instead of assessments aggregating six-tenths, as were made possible by the previous law. The future assessments, to this restricted amount, are limited to a period of ten years. This, obviously, is a change of great importance. The appellants sought an injunction, and their petition necessarily related to the assessments in December, 1928, and thereafter, as the payments previously made were not in any event recoverable by the banks. Considering the reduction in the extent of the obligation as to future assessments, we are unable to say that the statute in this modified form is confiscatory, or other than a reasonable method of liquidating the guaranty plan. In this view, the judgment of the supreme court of the state denying an injunction should be affirmed."

The substance of said opinion, as we understand it, is that, due to changed conditions resulting from new legislation, the court was unable to determine from the record whether the assessments were confiscatory. It therefore follows that the question now presented was not adjudicated in the above case.

The question now squarely presented is whether or not

the special assessments levied on December 15, 1928, April 17, 1929, and January 2, 1930, and the regular assessments levied on July 1, 1929, and January 1, 1930, in view of changed conditions, including our finding herein that the depositors' final settlement fund is invalid and the old law, known as the depositors' guaranty fund, is thereby restored to an · effective state, is confiscatory. If under the facts it is confiscatory, it is violative of the Fourteenth Amendment to the federal Constitution. If it is confiscatory, then it can no longer be sustained as a constitutional legislative enactment under the police power for a public purpose. If confiscatory, the public advantage does not justify taking of private property for what, in its purpose, is a private use.

In addition to the changed condition relating to changed statutory enactments, there are facts and circumstances inherent in the conditions of the banking business in this state since December, 1928. These facts are established by the record. It was a fact determined in 1928 that, due to the unprecedented number of failures of state banks, the depositors' guaranty fund was faced with a deficit of millions, and that it was impossible to restore the solvency of the fund. The comparatively small regular assessments had been levied and collected. In addition, the larger and more oppressive special assessments have been levied regularly for years, in the vain hope of restoring the solvency of the fund. The banks were faced with an indefinite continuance of these regular and special assessments. At the same time, the public purpose which this legislation undoubtedly had in the beginning was no longer served. From the condition of the fund itself, instead of a stabilizer of the state banks, it became a menace and a threat, sufficient to cause a great loss of public confidence in the banks with subsequent loss of business and earning power.

When this question was presented to this court at an earlier date, *Abie State Bank v. Weaver*, 119 Neb. 153 (December 7, 1929), the writer was of the opinion that

under the prevailing conditions the assessments levied under the law were then confiscatory. However, a majority of the court were then of a different opinion. In that case, on appeal the supreme court of the United States held: "That decision sustaining the law cannot be regarded as precluding a subsequent suit for the purpose of testing the validity of assessments in the light of later actual experience." *Abie State Bank v. Bryan,* 282 U. S. 765. The cases cited by the court, as noted elsewhere in this opinion, dealt with rate-making. In the case of *Municipal Gas Co. v. Public Service Commission,* 225 N. Y. 89, the opinion by Judge Cardozo so clearly states the principle, that the question of confiscation is affected by changing conditions, that we quote herewith:

"The argument is that a statute is either valid or invalid at the moment of its making, and from that premise the conclusion is supposed to follow that there is a remedy for present confiscation, but none for confiscation that results from changed conditions. We do not view so narrowly the great immunities of the Constitution, or our own power to enforce them. A statute prescribing rates is one of continuing operation. It is an attempt by the legislature to predict for future years the charges that will yield a fair return. The prediction must square with the facts, or be cast aside as worthless. *Ex parte Young,* 209 U. S. 123, 147, 148. It must square with them in one year as in another, at the beginning but equally at the end. In all such legislation, from the hour of its enactment, there thus inheres the seed of an infirmity which the future may develop. It is the infirmity that always waits upon prophecy; the coming years must tell whether the prophecy is true."

Have conditions so changed in the state banking situation that the assessments in controversy here were or are confiscatory? The result of the operation of all the banks in the state have been compiled from the record by both plaintiffs and defendants. The plaintiffs contend that the operation of the banks for a two-year period

resulted in a loss of $23,576.09, while the defendants argue that the operations resulted in a gain of $984,138.73. The discrepancy is due largely to the time when the loss by real estate owned by the banks is charged against them. That such a loss occurred cannot be denied. The argument that the banks in January, 1932, were in better condition and that their business was more profitable is not impressive. It is not supported by the facts pleaded, and admitted by the demurrer. Even taking the numerical argument submitted by the defendants, the alleged operating gain is not one-third the amount required to pay the assessments levied during the period. For a period consisting of some eleven months prior to December 15, 1928, it appears that the banks were able to earn more than enough to pay the assessments, although it is now clear from the record, which includes further experience since this case was before this court, that this supposed earning was more apparent than real for that in the spirit of optimism the banks had not yet charged off some of their losses. During the period from December 15, 1928, to January 1, 1931, covering approximately two years, there is either a loss or a profit so small that it is sufficient to meet less than one-third of the assessments levied against the banks for the benefit of the guaranty fund. The assessments for this period can only be paid by the banks by a direct taking of their capital stock. Such a collection would impair the capital of the banks and would weaken their stability. In this respect, the law itself defeats the public purpose for which it had hitherto existed; that is, in the interests of the public welfare to stabilize banking and business conditions. Such a taking under assessments levied under the guise cf the police power for the public welfare is a confiscation of property and deprives the plaintiffs of their property without due process of law in violation of section 1 of the Fourteenth Amendment to the federal Constitution and section 3, art. I of the Constitution of the state of Nebraska. Under such conditions, the public advantage

having long since vanished, and what was once a comparatively insignificant taking of private property having become such that it will impair and in time will dissipate the capital stock of the banks exclusively for a private purpose, it cannot be sustained under the police power of the state. *Noble State Bank v. Haskell,* 219 U. S. 104.

Furthermore, whether these assessments are levied and collected under the old depositors' guaranty fund or under the later enactment, the depositors' final settlement fund, there is no public purpose involved therein, a thing so necessary to the validity of said assessments.

It was stipulated by the parties at the time of trial in the district court, February 15, 1932, and made a part of the pleadings by reference:

"That in November, 1920, there were 1,012 state banks in Nebraska; that at the time of the filing of the petition in the case of Abie State Bank v. Bryan in the district court of Lancaster county, Nebraska, in December, 1928, the number had been reduced to 726, and that since that time 222 have become insolvent and have been closed by the department of trade and commerce and 12 have gone into voluntary liquidation, reducing the number of going banks in the state as of this 19th day of November, 1931, to 492; that the 726 going banks in December, 1928, had a combined capital of $19,001,000 and a combined surplus of $5,957,557.62."

Since the beginning of this suit until the time the decree was entered in the district court, a period of approximately three months, 50 of the plaintiff banks failed and were taken over by the department of trade and commerce for liquidation. For the period from December 15, 1928, to January 1, 1931, about two years, some 200 state banks were taken over by the department of trade and commerce as insolvent. Since the date of the decree in the trial court, February 15, 1932, until the 12th of September, 1932, 20 more banks have closed. This would seem to be irrebuttable testimony to the confiscatory character of the assessments. True, it has been argued

that the banks have not paid the assessments and therefore the matter of assessments for the depositors' guaranty fund or the depositors' final settlement fund have in no way affected the banks. This is not convincing, since it is not difficult to comprehend the effect of the collection of almost three million dollars from the banks of this state. Can it be doubted that such a collection under the present conditions would have greatly accelerated and increased the effects of the catastrophe?

Since the depositors' final settlement fund act became effective March 18, 1930, to the middle of September, 1932, 157 banks against which these assessments have been levied have closed. Of this, about 30 have reopened on some plan of reorganization. The total set-up in the 125 failed banks which have not reopened as a contingent liability for the depositors' final settlement fund is almost $700,000, while the amount so set up in the reopened banks is about $226,000. The collection of the $900,000 from those banks being liquidated or reorganized by the department of trade and commerce would be taking the money from one group of depositors who could not benefit from the provisions of the act and paying it to another group of depositors in banks which had failed prior to March 18, 1930. There is no public purpose involved to sustain such an action. It would be taking the money from one person and devoting it to a private use. The taking of money belonging to one class to pay claims of those of another class is in violation of the due process provision of the federal and state Constitutions. *Weaver v. Koehn,* 120 Neb. 114.

Finally, if these assessments are collected by the department of trade and commerce, they will become impressed with the judgment liens against the fund. *Bliss v. Bryan,* 123 Neb. 461. The proceeds will then be distributed among the depositors of a few banks, which failed more than five years ago. From any viewpoint from which we consider these assessments, it is apparent that all public purpose has been abandoned in relation

thereto and that it now amounts to taking the property of one class of citizens to pay another class in contravention of the constitutional rights of the plaintiffs. The logical conclusion reached from the foregoing consideration of the questions presented is that the judgment of the trial court should be reversed and the suit remanded, with directions to enter an injunction against the defendants, as petitioned by the plaintiffs.

REVERSED.