REQUESTED BY: Senator William E. Barrett Nebraska State Legislature State Capitol Lincoln, NE 68509
Dear Senator Barrett:
You have submitted to us several specific issues pertaining to LB 713 for an opinion:
1. IS THE NEBRASKA DEPOSITORY INSTITUTION GUARANTEECORPORATION AN AGENCY OR INSTRUMENTALITY OF THE STATE OFNEBRASKA?
Opinion: No.
David A. Domina, as Special Assistant Attorney General, issued an Attorney General's Opinion on December 5, 1983, in which he stated:
 The NDIGC is, by virtue of the nature of its statutory existence, a private corporation formed, controlled and operated for the benefit of its member institutions. The NDIGC is, of course, a special type of corporation, in that its assessments of members are regulated by statute, and its operating rules, procedures and activities are subject to regulation by the Department of Banking and Finance. Neb. Rev. Stat. Sec. 21-17,132 et seq., as amended. However, in its ultimate essential character, the NDIGC is a private corporation, operated and funded for private purposes, with optional membership.
The legislation authorizing the creation of this corporation specifically provided in Section 21-17,135(4): `no state funds of any kind shall be allocated to or paid to the corporation.'
The letter from the Department of Banking and Finance of August 7, 1978, granting approval stated in part:
 Final approval for the Nebraska Depository Institution Guaranty Corporation is granted subsequent to compliance with the following:
. . .
 3) That the Nebraska Depository Institution Guaranty Corporation will in no way mislead the public in believing that the Guaranty Corporation is affiliated with, or a department of, the State of Nebraska.
 4) That the word `insured' is not used at this time in any advertisement or publication, but rather the words `guaranty' or `protected' are used in place of the word `insured'.
`State agencies' are completely dependent, initially at least, on the appropriation of the legislature. Catania v.Univ. of Neb., 204 Neb. 304, 282 N.W.2d 27 (1979). There was no authorization for any state funding of NDIGC.
The Nebraska Supreme Court dealt expressly with the question of whether a corporation was an `instrumentality' of the State entitled to the limited immunity of the State from suit in Crete Mills v. Nebraska State Board of Agriculture,132 Neb. 144 (1937). In Crete Mills, the Nebraska State Board of Agriculture, a corporation organized by an act of the legislature, was held to not be an instrumentality of the State.
This conclusion was reached in spite of the fact that the corporation was partially funded by the legislature and was immune from state taxation by statute. In reaching its conclusion, the court relied on several facts.
First, like the NDIGC, the directors of the Board of Agriculture were selected from within the corporation in the same manner as private corporate directors. The Board of Agriculture, like the NDIGC, did not comply with Article IV, section 1 of the Nebraska Constitution, which requires that the heads of executive departments be appointed by the governor with the consent of the legislature.
Second, neither the Board of Agriculture nor the NDIGC complied with various funding restrictions imposed by the Constitution on State agencies. For example, funds were neither paid into the state treasury, nor paid out only after getting a state warrant. Instead, funds were collected and disbursed in the same manner as a private corporation operates.
The court then focused on the issue of whether the fact that the Board of Agriculture served a public purpose should modify its conclusion. It found that it should not, stating:
 `That a corporation is organized to promote objects of a public nature does not necessarily deprive it of its private character. . . . 'For instance, a bank created by the government for its own uses, whose stock is exclusively owned by the government, is in the stricter sense a public corporation. . . . But a bank whose stock is owned by private persons is a private corporation, although it is created by the government, and its objects and operations partake of a public nature.'
 Id. at 252-53 (quoting 1 Thompson, Corporations (3d ed.) pp. 35, 36, quoting Dartmouth College v. Woodward, 4 Wheat. (U.S.) 518, 688).
The NDIGC has apparently been treated as an `instrumentality' for federal tax immunity purposes. This fact, however, is irrelevant for purposes of a contract claim. In a contract action, an individual or entity can be liable only on contracts entered into by itself, or by an agent authorized to bind the individual or entity. The key question, then, is whether NDIGC was authorized as an agent to bind the State in contract. The term `instrumentality' is not a magic word for the determination of this issue.
Regardless, the apparent determination by the I.R.S. that NDIGC is an `instrumentality' is not conclusive for purposes of determining whether the State can be sued for the acts of NDIGC. Questions of the latter type are controlled entirely by state law wholly separate from federal tax law. Brush v. C.I.R., 300 U.S. 352, 57 S.Ct. 495
(1937). See also, Federal Reserve Bank v. Metrocentre,657 F.2d 183, n. 2 at 185 (8th Cir. 1981); Federal LandBank of St. Louis v. Priddy, 295 U.S. 229, 235,55 S.Ct. 705, 708 (1935).
The FDIC has been held to be an instrumentality of the United States for certain purposes. See e.g., SafewayPortland Emp. Federal Credit Union v. FDIC, 506 F.2d 1213
(9th Cir. 1974) (FTCA suit). However, the FDIC and the NDIGC are radically different in regard to their relationship to the government. Therefore, treatment of the FDIC as an instrumentality cannot in any way be relied upon for a determination of whether the NDIGC is an instrumentality for certain purposes. See, Crete Mills, supra.
The FDIC is statutorily government created, operated, owned and backed. The NDIGC is not.
(1) The statute creating FDIC states: `There is created
a Federal Deposit Insurance Corporation . . .'12 U.S.C. § 1811. The NDIGC statute states `depository institutionsmay form the NDIGC. § 21-17,132, R.R.S.
(2) The statutes state that FDIC directors are selected politically appointed by the President and approved by the Senate. 12 U.S.C. § 1812. NDIGC directors are selected privately by the members of the corporation. 21-17,133
(1982 Cum.Supp.) and Crete Mills, supra.
(3) The statutes state that FDIC is a `mixed-ownership government corporation'. 31 U.S.C. § 9101(2)(c). NDIGC is entirely private owned. § 21-17,135(4), R.R.S. and CreteMills, supra.
(4) FDIC accounts are fully backed by the United States Treasury. The Nebraska statutes and Constitution prevent State backing of the NDIGC. § 21-17,135, R.R.S. and Nebraska Constitution, Art. XIII, Sec. 3.
2. DID THE LEGISLATURE PROVIDE OR COULD THE LEGISLATUREHAVE PROVIDED FOR STATE LIABILITY FOR NDIGC OPERATIONSAND OBLIGATIONS?
Opinion: No.
The statutes under which the NDIGC acted specifically provide that the State will not be bound by the NDIGC's obligations to the depositors of insolvent institutions. The statutes state that `No state funds of any kind shall be allocated or paid to the corporation.' § 21-17,135(4). It is the NDIGC corporation which is obligated to the depositors. § 21-17,135(1)(a). The NDIGC is solely responsible to the depositors, and the State is prohibited by statute from aiding the NDIGC in fulfilling this obligation.
Again, the December 5, 1983, opinion of David A. Domina, Special Assistant Attorney General, is instructive. He stated:
 Unfortunately for the CSC depositors, the State of Nebraska has not actually guaranteed the deposits of any depository institution in this state. Indeed, legislation which would do so might, itself, contravene the constitutional mandate in question.' (Art. XIII, section 3, Nebraska Constitution) (p. 6)
The state constitution is also a part of any state contract.
Scotts Bluff County v. State, 133 Neb. 508 (1937). The following discussion will reveal that the state constitution prohibits any obligation of the State to depositors. That is, the State Constitution necessarily prohibits state liability stemming from NDIGC obligations.
The legislature could not constitutionally have provided for state liability for NDIGC operations even when the legislation authorizing creation of NDIGC was first adopted. Richard G. Kopf, Special Counsel to the Legislature, in a report on February 2, 1984, to the Special Commonwealth Committee stated:
 Perhaps the most well-reasoned Attorney General's opinion generally on this subject matter was that of the Special Assistant Attorney General David Domina when he issued on December 5, 1983, an opinion to Senator Harris. One of the questions presented to Mr. Domina by Senator Harris was whether or not the State could appropriate moneys to the Nebraska Depository Institution Guarantee Corporation for the benefit of depositors in Commonwealth Savings Company. Mr. Domina concluded that such an appropriation would be unconstitutional under Article XIII, Section 3, stating:
 The appropriation contemplated appears to be decidedly different from the expenditure of public funds for the purpose of attracting industry, creating jobs, encouraging economic growth, welfare and prosperity. This appropriation would appear to have, as its purpose, reimbursement of funds lost in a business venture by CSC depositors who relied upon two private enterprises, CSC and NDIGC, to protect their deposits against loss.
 In summary, the law regarding Article XIII, Section 3 is comprised of semantic distinctions which are at best difficult to understand. Nevertheless, certain things can be discerned. Our Constitution, which may be characterized as a `Granger document', was intended to restrict the rights of `government to provide financial aid to corporations.' Memorandum of Jack W. Rodgers, supra, at page 3. Except as provided for industrial development programs otherwise authorized for political subdivisions, or donations to clearly charitable organizations, a key point in finding that legislation is not prohibited by Article XIII, Section 3 is the non-existence of general fund moneys, as opposed to quasi-governmental bond revenues, State v. Douglas, supra; State v. Duxbury, supra. Therefore, in my opinion, the appropriation of general fund moneys to in essence reimburse funds lost in a business venture, such as a private bank or industrial loan and investment company, would, absent peculiar circumstances, contemplate an appropriation which is so `clear and palpable as to be immediately perceptible to the reasonable mind' in the sense of ultimately being for a private purpose.
(p. 13-14) (emphasis ours)
In Scotts Bluff County v. State, supra, the court set out the fundamentals of the creation and scope of a state contract, stating:
 "The authority to bind the state by contract need not be express, but may be implied; but it must be an actual, as distinguished from an apparent authority, and cannot be varied or enlarged by mere usage.
 The Constitution of the state is a part of state contracts, and, where an agent is appointed by law to contract for the state, the law under which he acts is as much a part of the contract made by him as if it were formally embodied in the contract. Statutes qualifying or limiting the grant of authority to contract are mandatory, and contracts not conforming thereto are not binding on the state. The governor and other executive officers of a state have no general authority to contract in its behalf and can bind the state only within the power specially conferred on them by law." 59 C.J. 170. Id. at 512.
In Scotts Bluff, supra, the statute involved limited the extent to which the state could be liable. The court stated:
 As applied to the controversy now before us, the conclusion is that the words of the statute, `the state shall not be liable for any money in excess of the appropriation made for that purpose,' by implication, became a part of these contracts entered into by and with the bridge contractors, out of which the present action proceeds; and the representatives of the state could not impose upon the state a contractual obligation under the state aid bridge act except subject to this controlling limitation. The state necessarily must be conceded the right to limit its obligations to the money expressly appropriated for these donations.
 Plaintiff's allegations in the pleading demurred to, viz., `that thereafter the Allied Contractors, Inc., commenced construction of said bridges and proceeded therewith; that shortly prior to the 1st day of October, 1920, the state aid bridge fund of the state of Nebraska became depleted and the state was without funds with which to pay its proportion of the cost of the remainder of the construction of said bridges,' by necessary effect, plead and admit that any further expenditures by the state would be in excess of the `appropriation made for that purpose,' and would transgress the statutory limitation expressly prescribed.
 It is obvious that no right to contribute can exist based upon the nonperformance by the state of Nebraska of a contract which it was prohibited from making, and as to which, after October, 1920, by necessary implication, further performance by the state was prohibited. Id. at 513-14.
3. CAN THE STATE OF NEBRASKA BE ESTOPPED FROM DENYINGTHAT THE NDIGC IS AN AGENCY OR INSTRUMENTALITY OF THE STATE,AND FURTHER ESTOPPED FROM DENYING THAT THE STATE IS LIABLEFOR NDIGC OBLIGATIONS TO DEPOSITORS OF COMMONWEALTH SAVINGSCOMPANY?
Opinion: No.
The State cannot do indirectly that which it could not do directly. Thus, an estoppel theory cannot be used to circumvent the constitutional prohibition against State liability for NDIGC obligations. This fact was recognized by Special Assistant Attorney General David A. Domina in the December 5, 1983, opinion, in which he concludes:
 . . . assuming that a miscellaneous claim could be appropriately filed by a CSC depositor asserting estoppel theory, it is my opinion that the appropriation of funds for the purpose of allowing the claim would be for a `private' purpose exclusively, and would contravene Neb. Const. Art. XIII. Sec. 3. (p. 6)
The Nebraska Supreme Court has held that the doctrine of estoppel has only a very limited application to the state, if at all, even aside from constitutional prohibitions.Omaha Nat. Bank v. Jensen, 157 Neb. 22, 43-44
(1943); Volker v. McDonald, 120 Neb. 508, 512,233 N.W. 890, 892 (1931). Further, the elements constituting an estoppel theory are highly factual.
These elements have certainly not been satisfied on the bare evidence presented at this time. Accordingly, based on the fact that the constitution would prohibit an estoppel theory in this case, that an estoppel theory can rarely, if ever, be asserted against the State, and that the evidence does not support an estoppel theory in this case, the State cannot be liable on an estoppel theory to the depositors of Commonwealth Savings Company.
4. CAN THE LEGISLATURE PROVIDE FOR STATE LIABILITY FORNDIGC OBLIGATIONS TO DEPOSITORS OF COMMONWEALTH SAVINGS COMPANYBY MEANS OF PAYMENT OF THE CLAIM CONTAINED IN LB 713?
Opinion: No.
It is our opinion that LB 713 is not the proper vehicle by which to settle the claims of depositors of Commonwealth Savings Company against the state for several reasons.
(a) The bill does not contain sufficient specific language effecting a release of all possible claims against the State of Nebraska. Under Sections 81-8,239.05 et seq. the state may be required to reimburse or indemnify employees as to liability imposed upon the employee. This act should therefore provide for a release of all state employees also.
(b) Mary Croissant, Louisa R. Lessman, Timothy J. Gill and Shea W. Pence are not proper claimants. In Anderson v.State, Docket 383, Page 216, the District Court of Lancaster County, Nebraska, held that the Receiver is the owner of the claims and that the cause of action belongs to the Receiver not the individual depositors. There has been no determination that there is a class action. In the Anderson case the court concluded that this is not a proper class action.
(c) It is questionable as to whether it is proper to have the claimant determine the amount to be paid.
(d) As will be set forth in the response to inquiry #5, the Act is constitutionally suspect.
5. WOULD PAYMENT OF THE MISCELLANEOUS CLAIM CONTAINEDIN LB 713 BE IN CONTRAVENTION OF ARTICLE XIII, SECTION 3, ORANY OTHER PROVISIONS OF THE NEBRASKA CONSTITUTION?
Opinion: The act is constitutionally suspect.
(a) Article XIII, section 3 of the Nebraska Constitution provides that the legislature may not extend the credit of the State in aid of any individual, association or corporation. It provides:
 The credit of the state shall never be given or loaned in aid of any individual, association, or corporation, except that the state may guarantee or make long term, low interest loans to Nebraska residents seeking adult or post high school education at any public or private institution in this state. Qualifications for and the repayment of such loans shall be as prescribed by the Legislature. (Amended, 1968.)
In an Attorney General's opinion dated December 5, 1983, Mr. David Domina, after reviewing the law, stated:
 Arguments suggesting ostensible `public' purposes of such an appropriation can certainly be made. However, in the language of the Nebraska Supreme Court in Chase v. Douglas County, supra, it is my opinion that the private purpose and character of the contemplated appropriation is so `clear and palpable as to be immediately perceptible to the reasonable mind.' Accordingly, it is my opinion that the appropriation under consideration cannot be made by the Nebraska Legislature without contravening the mandate of Neb. Const. Art. XIII, Sec. 3.
(b) In 1909, a guaranty fund for the protection of bank depositors was created. Laws of Nebraska, 1909, c. 10, p. 87; Compiled Statutes of Nebraska 1922, § 8024 et seq. In 1923, the legislature created the Guarantee Fund Commission for the purpose of assisting in conserving and administering the guarantee fund. Laws of Nebraska, 1923, c. 191, p. 438. The Guarantee Fund Commission was similar to the NDIGC, although it had a closer relationship with the government (i.e. it was created by statute and the governor appointed the members of the commission).
With the demise of the economy in general, and the banking industry in particular in the late 1920's, the Guarantee Fund Commission found its fund depleted. By December of 1928, the Guarantee Fund Commission had a $15,948,350.11 deficit. See Alie State Bank v. Weaver, 119 Neb. 153,156, 227 N.W. 922 (1929), aff'd 282 U.S. 765, 51 S.Ct. 252
(1931).
The legislature sought to aid the depositors of insolvent banks who were thus left unprotected by the Guarantee Fund Commission. In 1929, the legislature appropriated a sum of money from the State treasury for this purpose. Laws of Nebraska, 1929, c. 33, p. 139.
The governor, Arthur J. Weaver, sought a declaratory judgment as to whether this appropriation was valid, and if so, how it was to be executed. Weaver v. Koehn, 120 Neb. 114,231 N.W. 703 (1930). Three district court judges of Lancaster County sitting en banc, held the appropriation unconstitutional. The Supreme Court of Nebraska agreed with the district court judges in all respects.
The court stated:
 The evidence was submitted and the suit was argued in the district court for Lancaster county before three district judges, namely, the Honorables Shepherd, Broady, and Chappell, sitting en banc, and the court, so organized, found, adjudged and decreed that the above named appropriation of $260,111.37, for the reimbursement of depositors in failed banks, was and is an unconstitutional proceeding and is therefore void and of no effect. The following reasons in support of their conclusion appear in the judgment rendered by the above named court, in respect of the invalidity of the appropriation in suit, namely:
 "First, because it is offensive to the due process provision of the Constitution, and not for a public purpose; secondly, because the title to the act is insufficient to disclose the nature, purpose, and the effect of said appropriation, and of the legislation resulting therein; and, thirdly, because said appropriation involves the taking of the property of the public generally for the relief of private persons without obligation on the part of the state, either legal or moral."
From the judgment so rendered, the plaintiff has appealed.
Chapter 33, Laws 1929, so far as applicable here, follows:
 "There is hereby appropriated out of any money in the state treasury not otherwise appropriated the sum of $260,111.34, or so much thereof as may be necessary, to refund to depositors in banks closed by the department of trade and commerce such part of their deposits as was deposited in any of said banks by any of said depositors after said banks were closed and while operated by and in charge of the guaranty fund commission. The department of trade and commerce shall ascertain and determine which depositors are entitled to payment under this section and the amount to be paid to each of said depositors, said amount being the amount of the claim as allowed by the district court against the guaranty fund less any payments made on said claim from any source. The auditor of public accounts is hereby authorized and directed to draw warrants on the state treasury for the amounts so determined upon the presentation of proper vouchers approved by the department of trade and commerce and the state treasurer shall pay the same out of moneys in the general fund not otherwise appropriated."
 The judgment is clearly for affirmance. The banking business, as it relates to state banks in Nebraska, is recognized as being quasi-public in its transactions with the people generally, and particularly in respect to its transactions with depositors of money in such state banks. And this, of course, includes individuals and corporations and, in effect, all depositors of money therein. But the appropriation of money by the state, to reimburse depositors for losses sustained by them in failed banks, clearly appears to be the taking of money belonging to one class to pay the claims of those in another class.
 And this is in violation of the due process provision of the federal and state Constitutions. Clearly it has not yet come to pass that the state, in its supervision of the banking business, has become an eleemosynary institution.
 In view of the facts as presented, it clearly appears to us that the losses of individual depositors in state banks cannot lawfully be made up nor paid from the appropriation of money that belongs to all of the people of the state. The deposits herein were merely business transactions between the bank and the depositor, and the public should not be made to pay for the losses that a depositor may have suffered in such transactions.
In State v. Cornell, 53 Neb. 556, it is said:
 "It is for the legislature in the first instance to decide what is and what is not a public purpose, but its determination of the question is not conclusive upon the courts.' And in Abie State Bank v. Weaver, 119 Neb. 153, this language was used: `It is elementary that it is not within the province of the courts to annul a legislative act unless its provisions so clearly contravene a provision of the fundamental law, or it is so clearly against public policy, that no other resort remains.' In Gray, Limitations of Taxing Power, 123, sec. 170, the author says: `The state exists for the benefit of all; any devotion of its powers to merely private ends is such a perversion of its purpose and duties as to be utterly void; and it is the duty of the judicial agents of the state to protect the community from such perversion."
. . .
 The judgment of the learned trial judges is in all things affirmed.
 Id. at 116-18. (emphasis ours)
The facts involved in this decision are so similar to those presented by this claim that one must carefully consider this previous determination. Unless the Supreme Court overrules this decision, this proposed bill is unconstitutional.
CONCLUSION
As this bill is presently drafted, there are serious constitutional questions as to its validity. This subject area, however, continues to be of major concern to many in and out of government. There is, in our opinion, a procedural vehicle by which a constitutionally valid settlement might be effected. The State Tort Claims Act provides such a procedure. Under that Act, if there is a pending action, the claimant and the Attorney General can agree upon a proposed settlement. The settlement is then presented to the District Court for approval. If approval of a settlement in excess of $50,000 is obtained from the court, an appropriation of the funds by the legislature is necessary. In our opinion this procedure is constitutionally sound.
Respectfully submitted,
Edwin C. Perry, Special Assistant Attorney General